[868 NYS2d 40]

In the Matter of the Adoption of JOHN DOE, an Infant. LMB, Respondent; ERJ, Appellant.

First Department, November 25, 2008

---

### APPEARANCES OF COUNSEL

*Cohen Lans LLP*, New York City (*Mara T. Thorpe* of counsel), for appellant.

*Cohen Hennessey Bienstock & Rabin P.C.*, New York City (*Bonnie E. Rabin* and *Timothy W. James* of counsel), for respondent.

### OPINION OF THE COURT

CATTERSON, J.

In this action, in which appellant ERJ claims she is the current, rightful adoptive parent of a Cambodian orphan, we find that the act of state doctrine may not be used in an adoption proceeding where the parties have invoked the jurisdiction of the State of New York, and all the parties including the child are domicilaries of this state. To find otherwise would be an unprecedented surrender of this Court's jurisdiction, and would allow a foreign sovereign to dictate parental rights and the legal status of New York domicilaries—even on a whim.

This case involves a bitter custody battle between ERJ and LMB, over a five-year old Cambodian orphan named John Doe. Both parties claim to have legally adopted John Doe.

ERJ is an heiress to one of the largest fortunes in America. Although she is a United States citizen who resides in New York, ERJ is a person of considerable influence in Cambodia, where she has made sizeable contributions to charitable endeavors. LMB, a man of considerably less wealth, is a citizen of both the United States and Trinidad and Tobago, and has residences in both Manhattan and Florida.

In 2003, ERJ and LMB entered into a romantic relationship and shortly thereafter, the couple began to discuss adopting a child. The record also reflects that as the relationship developed, ERJ became increasingly involved with an orphanage she had established earlier that year in Cambodia.

While ERJ was on a trip to the Cambodian orphanage, she met John Doe. According to LMB, ERJ called him from Cambodia and stated, "I found your son." Although ERJ denies

that she made this statement, there is no dispute that in June 2003, LMB flew to Cambodia and met John Doe. Thereafter, the parties decided that they would try to adopt the child.

Attempting to circumvent the U.S. visa restrictions on Cambodian orphans,[1] the parties planned that LMB, as a citizen of Trinidad and Tobago, would legally adopt John Doe and become his sole legal parent. Then, since LMB is also a U.S. citizen, John Doe would be granted U.S. citizenship as the child of a U.S. citizen. In the meanwhile, the parties obtained temporary legal status for John Doe in the U.S. by bringing him to New York[2] on a medical visa in August 2003. John Doe was granted a visa for a six-month stay in the United States to receive medical care. Since the expiration of a six-month extension in August 2004, John Doe has resided in the United States without legal immigration status.

In May 2004, LMB applied to the Cambodian government to adopt John Doe pursuant to article 10 of Sub-Decree No. 29. Sub-Decree No. 29 governs the procedures for adoption by foreign nationals of orphans under the jurisdiction of the Cambodian government. It was promulgated in response to concerns about trafficking and baby-selling. Among other things, the statute provides for a "Giving and Receiving" ceremony, during which a Cambodian official delivers the child to the adoptive parent in person. This provision in Sub-Decree No. 29 was designed to keep Cambodian orphans out of the hands of child traffickers.

On June 23, 2004, despite the fact that LMB did not participate in a "Giving and Receiving" ceremony, the Cambodian government issued an adoption certificate,[3] granting "final approval" on LMB's request to adopt John Doe. On July 2, 2004, the Chief of Commune and Registrar of Prek Eng Commune, Kien Svay District, Kandal Province, issued an amended birth certificate for John Doe listing LMB as John Doe's "Father."

---

1. Normally, a U.S. citizen who adopts a foreign orphan can obtain an IR-3 or IR-4 visa for the child. Since December 2001, however, America has refused to issue such visas for Cambodian orphans due to concerns over allegations of widespread baby-selling occurring in Cambodia.

2. The Cambodian government granted ERJ's request for permission to bring John Doe to the U.S. for medical treatment with the proviso that "[a]fter recovery from illness, he will be sent back to Cambodia."

3. This certificate has been variously characterized as an "adoption permission certificate," a "certification Letter of Adoption," or a "certifying Letter of Adoption."

The parties' plan to obtain full legal status in the U.S. for John Doe failed after Trinidad denied LMB's application to readopt John Doe. Shortly thereafter, their romantic relationship soured and ERJ decided that she was going to adopt John Doe herself.[4]

At this point, the record reflects a classic case of "he-said/she-said." What is undisputed however is that, on March 14, 2005, LMB signed a letter addressed to the Cambodian government (hereinafter referred to as the March 2005 Letter), relinquishing the permission that Cambodia had granted him to adopt John Doe. The letter was drafted by ERJ's immigration attorney and was submitted to the Cambodian government on ERJ's behalf. It stated, in pertinent part:

> "In June of 2004, I was granted permission to adopt the orphan child named [John Doe], and to bring him up in Trinidad and Tobago. This permission was communicated in Letter of Approval No. 629 D.A., sent from the Office of the Council of Ministers on June 16, 2004, and Adoption Certificate No. 396 MOSALVY, issued on June 23, 2004 . . . I am very grateful to the Kingdom of Cambodia for having granted this permission. It is no longer possible, however, for me to adopt the child and to bring him up in Trinidad and Tobago, as had been contemplated when this permission was granted. Therefore, I wish to relinquish the permission that was granted to me by the Kingdom of Cambodia to adopt the orphan child named [John Doe]."

After LMB signed the March 2005 Letter,[5] ERJ submitted it to the Cambodian authorities.

Six months later, in September 2005, ERJ wrote to the Cambodian Ministry of Social Affairs, Veterans and Youth Rehabilitation (hereinafter referred to as the MOSAVY) and

---

**4.** The ban on the issuance of IR-3 and IR-4 visas to Cambodian "orphans" does not extend to the issuance of an IR-2 visa to a Cambodian child who, in addition to being the subject of a full and final adoption, has lived with the adopting (unmarried) parent, as legal custodian, for two years. (*See* 8 USC § 1101 [b] [1] [E].)

Because John Doe resided with ERJ, she was the only person who would have had standing to obtain an IR-2 visa for John Doe.

**5.** LMB claims that he acceded to this plan on the representation that he would obtain a second parent adoption here once ERJ was successful in her adoption of John Doe. ERJ denies any such promise or assurance.

requested permission to adopt the child.[6] In October 2005, the Cambodian government issued an adoption certificate, granting "final approval" on ERJ's request to adopt John Doe. Notably, like LMB, ERJ never participated in a "Giving and Receiving" ceremony.

In January 2006, ERJ petitioned the New York County Surrogate's Court for permission to readopt John Doe. Her petition, signed by counsel, included ERJ's sworn statement that she had adopted John Doe in Cambodia, a copy of her Cambodian adoption certificate dated October 11, 2005 evidencing that adoption, and a copy of John Doe's Cambodian passport. ERJ also submitted John Doe's *original* birth certificate which lists both father and mother as "Unknown," and not the recently issued one naming LMB as John Doe's father.

Because the Surrogate believed that this was a readoption, and because John Doe had already been determined an orphan, no notice to any other party was required, and none was given. On April 12, 2006, with no opposition, and no reason to doubt the bona fides of the petition, the Surrogate granted the readoption of John Doe by ERJ.

Four months later, in August 2006, LMB commenced this proceeding seeking, inter alia, vacatur of ERJ's order of adoption and immediate visitation with John Doe. LMB asserted that ERJ's "readoption" petition had been procured by a fraud on the court insofar as ERJ had not revealed the fact that the Cambodian authorities had listed LMB on John Doe's birth certificate as his adoptive father.

The Surrogate reopened the case. Then, after months of conflicting affidavits and memoranda of law as to, inter alia, whether Cambodia grants full and final adoptions, she concluded that a full-scale trial of those issues was necessary.

In the meantime, in December 2006, purporting to shed light on the issues before the Surrogate, ERJ submitted two documents from Cambodian governmental entities. The first document was issued by the MOSAVY (hereinafter referred to as the MOSAVY Letter), dated October 24, 2006. It stated, in pertinent part:

---

**6.** In July 2004, there was a governmental reorganization and MOSALVY was divided into two ministries, including the Ministry of Labor and Vocational Training (MOLVT), which is currently responsible for enforcement of child labor issues, and the Ministry of Social Affairs, Veterans and Youth Rehabilitation (MOSAVY).

"[T]here truly has been an appropriate and lawful decision of the Royal Government granting you permission to adopt [John Doe].

"As for the case of [LMB], he also submitted an application to adopt [John Doe]. However, after the Royal Government issued its official decision, he failed to attend a handing over ceremony of [John Doe] which is required by Sub-Decree #29 and he also submitted a letter of refusal to adopt [John Doe]."

The second document, the Sor Chor Nor 1850 (hereinafter referred to as the SCN), dated December 1, 2006, was issued by the Council of Ministers.[7] The SCN repeats that ERJ had "properly and legally received an approval from the Royal Government of . . . Cambodia to adopt a child name[d] [John Doe]." It also states that because LMB did not participate in a Giving and Receiving ceremony, LMB's adoption of John Doe is "null and void." Notably, the SCN does not provide any explanation as to how ERJ's adoption was valid despite the fact that she also did not attend a Giving and Receiving ceremony.

After a trial lasting more than two weeks which began in March of 2007, the Surrogate granted LMB's motion to vacate ERJ's adoption of John Doe, but ordered that John Doe remain in ERJ's custody and permitted LMB to begin visitation with John Doe. First, the Surrogate noted that ERJ "made substantial, material misrepresentations, wholly aside from her non-disclosure of the confused legal situation involving LMB, in her petition for re-adoption." Specifically, she stated that ERJ "denied any substance abuse, when, in fact, she had recently returned from five weeks in a rehabilitation facility."

The Surrogate stated, "These serious misrepresentations would, themselves, be cause for vacating the adoption." The Surrogate further found that Cambodia grants full and final adoptions, as opposed to mere permission to adopt a Cambodian orphan in a foreign country.[8] She further determined that the issuance of an adoption certificate, not the Giving and Receiving ceremony, finalizes adoption and thus LMB's adoption of John Doe was valid. Moreover, since LMB had been given an

---

7. The Cambodian Council of Ministers is the highest level of Cambodia's executive branch.

8. ERJ does not attack this finding on appeal.

amended birth certificate naming him as John Doe's father the Surrogate found that fact tended to prove he had been granted a full and final adoption.

Aptly analogizing LMB's March 2005 renunciation letter to a natural parent's consent to the adoption of his/her child, the Surrogate then properly applied New York law. (*See Stubbs v Weathersby*, 320 Or 620, 629-630, 892 P2d 991, 997 [1995] [where the court applied the law of the forum state in determining whether a mother consented to the adoption of her child]; *In re Adoption of Hunter*, 421 Pa 287, 290-291, 218 A2d 764, 767 [1966]; *In re Adoption of M.L.L.*, 810 NE2d 1088, 1095 [Ind Ct App 2004]; *Matter of Adoption of Child by T.W.C.*, 270 NJ Super 225, 238-240, 636 A2d 1083, 1090-1091 [App Div 1994].) The Surrogate found that the March 2005 Letter complied with neither Domestic Relations Law § 115-b (2) and (4) nor Social Services Law § 384 and thus, since the proper procedures for surrendering parental rights had not been followed, she declared that LMB was John Doe's adoptive father. Even if the validity of the March 2005 Letter were governed by Cambodian law, the Surrogate credited trial testimony that under Cambodian law, no legal surrender of parental rights can occur without court involvement.

Finally, the Surrogate determined that the act of state doctrine did not apply to adoptions and that in any event, neither the MOSAVY Letter nor the SCN were acts completed by a foreign state completely within its own territory.

In her decision, the Surrogate noted that U.S. courts are not required to defer to a foreign country's judicial and, by parity of reasoning, executive interpretation of its own laws where "fundamental standards of procedural fairness" have not been observed. (*See Finanz AG Zurich v Banco Economico S.A.*, 192 F3d 240, 246 [2d Cir 1999].) The Surrogate stated,

> "At the time [the MOSAVY Letter and the SCN] were issued, the instant litigation was in full swing, and they were clearly sought for the purpose of influencing the outcome. The documents were obtained ex parte, through a 'procedure' previously unknown to LMB and his counsel, and nowhere prescribed in any written Cambodian authority submitted to this Court. To the contrary, to the extent that they purport to decide a controversy between two parties, they appear to be unconstitu-

tional under the Cambodian separation of powers that reserves such resolution to the judiciary."[9]

On appeal, ERJ contends that the MOSAVY Letter and the SCN are acts of the Cambodian government that fall within the act of state doctrine. These documents resolve this case because both: (1) interpret Sub-Decree No. 29 as creating a mandatory requirement that foreign nationals adopting Cambodian orphans participate in a "Giving and Receiving" ceremony; (2) conclude that LMB did not adopt John Doe because he did not participate in the "Giving and Receiving" ceremony and also sent a letter relinquishing his right to adopt him; and (3) state that her adoption of John Doe was valid under Cambodian law and that LMB's was not. In other words, ERJ argues that under the act of state doctrine, the Surrogate was required to treat the MOSAVY Letter and the SCN as binding and therefore, LMB's petition to vacate the order of adoption should have been dismissed because ERJ had permission to adopt John Doe.

LMB argues that John Doe was not legally available for adoption by ERJ without his consent because he was the child's sole legal parent since the Cambodian government granted him a full and final adoption in June 2004. LMB further asserts that the act of state doctrine is completely inapplicable for the dual reasons that the MOSAVY Letter and the SCN do not constitute "acts" and that, in any case, the doctrine's territorial limitation precludes its application in the case at bar because the MOSAVY Letter and the SCN were directed at Surrogate's Court and this country rather than being only applicable within Cambodian territory.

For the reasons set forth below, we agree with the petitioner and affirm the order of the Surrogate.

The act of state doctrine, now more than a century old, was first enunciated by the U.S. Supreme Court in *Underhill v Hernandez* (168 US 250, 252 [1897]): "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory."

---

**9.** The Constitution of the Kingdom of Cambodia provides, at chapter XI, article 129: "Only judges shall have the right to adjudicate"; and at chapter XI, article 130: "Judicial power shall not be granted to the legislative or executive branches." In addition, with regard to complaints concerning the decisions of officials or official bodies, the "settlement of complaints and claims shall be the competence of the courts." (Ch III, art 39.)

The doctrine is primarily premised on the principle of separation of powers; because the Executive is charged with conducting foreign relations, the Judiciary should not unnecessarily interfere with that power by sitting in judgment on the acts of a foreign sovereign. (*Banco Nacional de Cuba v Sabbatino*, 376 US 398 [1964].) The doctrine "requires that . . . the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." (*W. S. Kirkpatrick & Co. v Environmental Tectonics Corp., Int'l*, 493 US 400, 409 [1990].) This makes practical sense: "When another country's act has come to complete fruition within its dominion, it would be a waste of judicial resources for courts of the United States to condemn the result." (*Bandes v Harlow & Jones, Inc.*, 852 F2d 661, 666 [2d Cir 1988] [courts in one country should avoid inquiries respecting the validity of the acts executed by a foreign sovereign within its own territory].) By contrast, "the foreign sovereign is acting beyond *its* enforcement capacity when it involves itself within our nation's jurisdiction." (*Id.*)

We find that the Surrogate properly determined that the act of state doctrine is generally applicable in situations where a party seeks to prevent an American court from questioning the validity of a foreign government's expropriation of property located within that government's territory (see generally *Banco Nacional de Cuba v Sabbatino*, 376 US 398 [1964], *supra*; *Perez v Chase Manhattan Bank*, 61 NY2d 460 [1984], *cert denied* 469 US 966 [1984]), and that the question of whether the doctrine should be extended to foreign adoptions is one of first impression for New York courts.[10]

The act of state doctrine requires an American court to refrain from examining the validity of an act of a foreign state by which that state has exercised its jurisdiction to give effect to its public concerns. (*See* Restatement [Third] of Foreign Relations Law § 443, Reporters' Note 10 ["in general . . . the act of state doctrine is directed to acts of general application decided by the executive or legislative branches"].) Since an adoption can be

---

10. The only case that appears to deal with the issue occurred outside of New York. In *In re McElroy's Adoption* (522 SW2d 345 [Tenn 1975], *cert denied sub nom. McElroy v Taylor*, 423 US 1024 [1975]), the petitioners in a transnational adoption invoked the doctrine in an attempt to prevent a Tennessee court's reexamination of a child's adoptability. The court flatly rejected the applicability of the doctrine since the decision that the child was suitable for adoption was made by municipal authorities, rather than the central government of the foreign nation, and thus, there was no "act" completed by a sovereign state (only the political subdivision of a nation).

characterized as an administrative act which essentially involves a matter of *private* interests, we are reluctant to extend the act of state doctrine to foreign adoptions. (*See* McMillan, *International Adoption: A Step Towards a Uniform Process*, 5 Pace Int'l L Rev 137, 154 [1993] [commenting on how the act of state doctrine will seldom be applicable to adoptions].)

In any event, because the MOSAVY Letter and the SCN cannot be considered "acts of state" within the meaning of the doctrine, and since the child was residing here in New York and thus beyond the reach of the coercive power of the Cambodian government at the time both documents were issued, we find that the doctrine is inapplicable.

First, there is no predicate sovereign act upon which to apply the act of state doctrine. The MOSAVY Letter merely declares that "there truly has been an appropriate and lawful decision of the Royal Government [of Cambodia] granting [appellant] permission to adopt [John Doe]." (*See Gross v German Found. Indus. Initiative*, 456 F3d 363, 392 [3d Cir 2006] [where a letter from the German Ministry of Finance which concluded that the defendant did not have to pay any more interest was not an "official act of a foreign sovereign"].) Similarly, the SCN merely offers the conclusory statement that Cambodia's prior approval of LMB's request to adopt John Doe "is considered as null and void." Moreover, the determinations made in the SCN and the MOSAVY Letter simply involve an attempt to influence the competing interests of private litigants and thus do not qualify as an act of a sovereign state in its own public interest. (*See* Restatement [Second] of Foreign Relations Law § 41, Comment *d*.) In fact, the penultimate sentence of each document is: "Therefore, please be informed and use this letter as you [ERJ] see fit for the best interest of [John Doe]."

Even assuming arguendo that the MOSAVY Letter and the SCN constituted "acts of state" within the meaning of the doctrine, the act of state doctrine's territorial limitation precludes its application to the MOSAVY Letter and SCN. The doctrine's territorial limitation requires that the doctrine apply to acts done by a foreign state within its own territory and applicable there. (*See Bandes*, 852 F2d at 666.) A foreign government's act is not "done" or "committed" or "taken" within its own territory simply because the government officials responsible for the act were physically located within that nation's boundaries at the time when they acted. Rather, the doctrine applies only when the subject matter of the act is located within the

geographical boundaries of the foreign state. (*Allied Bank Intl. v Banco Credito Agricola de Cartago*, 757 F2d 516, 521 [2d Cir 1985], *cert dismissed* 473 US 934 [1985].)

Here, the MOSAVY Letter and the SCN did not come to complete fruition within Cambodia, and indeed were designed to resolve the dispute between the parties in New York. (*See Bandes*, 852 F2d at 666.) Moreover, there is no dispute that when the MOSAVY Letter and the SCN were issued, John Doe had been living in New York for more than three years. (*See Allied Bank Intl.*, 757 F2d at 521 [the act of state doctrine does not apply when expropriated property is located outside the expropriating state].)

It is true that in certain limited situations, even when an act of a foreign state affects property outside of its territory, the considerations underlying the act of state doctrine may still be present and the doctrine may be invoked. Here, however, the facts do not present such a scenario. (*Cf. In re Philippine Natl. Bank*, 397 F3d 768, 773 [9th Cir 2005].) Indeed, the policies underlying act of state cases—international comity and respect for the sovereignty of foreign nations on their own territory— would hardly be served by finding that the Surrogate was under an obligation to defer to the MOSAVY Letter and the SCN. (*W. S. Kirkpatrick & Co.*, 493 US at 408.) At the time the MOSAVY Letter and the SCN were issued, John Doe had been domiciled in New York for more than three years and there was no plausible basis for Cambodia to exercise jurisdiction over the parties. (*See Barry E. v Ingraham*, 43 NY2d 87, 90 [1977] [finding that comity should not be afforded to the determination of a body "lack(ing) any foundation under Anglo-American concepts of jurisdiction to effect a change in (an) infant's status"].)

The dissent posits the question: why, if Cambodia possessed the authority to grant adoption to LMB after John Doe had left Cambodia, it lacked the authority to reconsider or revoke the adoption. However, there is nothing in the record to suggest that Cambodia *ever* revoked LMB's adoption. Certainly, the record does not indicate that LMB was ever provided with any notice that his name had been removed from John Doe's birth certificate. Neither was LMB ever asked to return his adoption certificate, or more importantly, to return the child.

Because John Doe, ERJ and LMB are all domiciliaries of New York, it remains to New York courts to determine the adoption status of John Doe. (*See* Carlson, *Transnational Adoption of Children*, 23 Tulsa L Rev 317, 362 [1988] [commenting on how

an adoption overseas does not relieve a state court of its concern over an immigrant child's adoptability because the state has a keen interest in the child's welfare].)

Plainly, to allow the Cambodian government to intervene in New York matters years after it granted LMB the adoption would involve an unprecedented surrender of the jurisdiction of this Court. It would also leave adoptive parents like LMB "twisting in the wind" while they wait to see whether a foreign government would change its mind about the grant of a "full and final" adoption, potentially years after the adoption.

We have considered ERJ's remaining claims and find them unavailing.

Accordingly, the order of the Surrogate's Court, New York County (Kristin Booth Glen, S.), entered October 11, 2007, which granted petitioner LMB's application for immediate visitation and for vacatur of a prior order, same court and Surrogate, granting respondent ERJ's application to readopt John Doe, should be affirmed, without costs.

NARDELLI, J. (dissenting). In early 2003, ERJ, a United States citizen who lives in New York, and LMB, a citizen of both the United States and Trinidad and Tobago, who resides in New York and Florida, began a romantic relationship. Also in 2003, ERJ established an orphanage in Cambodia, where she visited and met John Doe, an infant Cambodian orphan who was in need of medical care. ERJ obtained a U.S. visa and a Cambodian passport for John Doe in order to bring him to the United States for emergency medical treatment. Both parties grew progressively attached to the child, who stayed in ERJ's home; the parties dispute whether LMB was a cohabitant or merely an intermittent visitor. In any event, LMB applied to the Cambodian Ministry of Social Affairs, Labor, Vocational Training and Youth Rehabilitation (subsequently reorganized as the Cambodian Ministry of Social Affairs, Veterans and Youth Rehabilitation [MOSAVY]) to adopt John Doe, which was granted in June 2004; the next month, the boy's Cambodian birth certificate was changed to name LMB as his father. Thereafter, LMB attempted to adopt John Doe in Trinidad and Tobago, but was unable to do so because of certain Trinidadian laws.

The parties' romantic relationship terminated in July or August 2004, but John Doe continued to reside with ERJ, who wrote to LMB in November that she was going to try to adopt the child herself. LMB responded:

"You asked me to stop working on [John Doe's] adoption about 2 months ago, I did as you asked . . . I will stay out of [John Doe's] life, this will be in his best interest. I will no longer call him or come to see him . . . Good luck with the adoption process, please let me know if there is anything I can do to help."

By letter dated March 14, 2005, LMB informed MOSAVY:

"In June of 2004, I was granted permission to adopt the orphan child named [John Doe] . . . It is no longer possible, however, for me to adopt the child and to bring him up in Trinidad and Tobago, as had been contemplated when this permission was granted. Therefore, I wish to relinquish the permission that was granted to me by the Kingdom of Cambodia to adopt the orphan child named [John Doe]."

ERJ then wrote to MOSAVY requesting permission to adopt the child "through a proceeding in the courts in the United States." In October 2005, MOSAVY officially granted ERJ permission to proceed with the adoption and issued an adoption permission certificate.

On January 11, 2006, ERJ filed a petition with the Surrogate's Court to adopt John Doe. LMB's attorney informed ERJ's attorney that "unless an arrangement" could be reached providing LMB with a visitation schedule, some decision-making consultation, and a "financial component . . . to create a comfort zone for [John Doe] so that he is not directly aware of the vast disparity between the wealth of [LMB] and the wealth of [ERJ]," LMB was "prepared to contest her adoption, and if necessary, to show that without his presence she is an unfit single parent."

Nevertheless, LMB did not seek to intervene, and in April 2006, Surrogate's Court granted ERJ's adoption petition. In August 2006, LMB moved to vacate the adoption order, on the ground that it had been procured through fraud by not revealing that he was the child's adoptive father. Surrogate's Court appointed a guardian ad litem, who, after interviewing the parties and investigating the matter, determined that it was not in the child's best interests to vacate the adoption order. Sur-

rogate's Court decided to hold a hearing on Cambodian law, but denied the guardian's request to participate in the hearing.*

During the hearing, ERJ submitted a clarification letter from the Minister of MOSAVY, dated October 24, 2006, stating that although LMB had originally applied to adopt John Doe, he had failed to attend a "handing over ceremony" as required by Cambodian law (Sub-Decree No. 29) "and he also submitted a letter of refusal to adopt [the child]"; the letter confirmed that ERJ had been granted permission "to complete the adoption of [John Doe] in the USA." On December 1, 2006, the Cambodian Council of Ministers, the highest level of that country's executive branch, issued a document, Sor Chor Nor 1850, declaring that ERJ had been granted permission to adopt the child and that LMB:

> "had previously received an [adoption] approval, but failed to participate in the handing over ceremony which is required by the Sub decree No 29, and additionally wrote a letter establishing and informing his intention to withdraw the right to adopt a child named [John Doe]. Therefore, the approval to [LMB's] request to adopt this child is considered, as null and void."

Cambodian Sub-Decree No. 29 provides that, in order to effect an adoption under Cambodian law, following approval, the orphan must be physically and formally handed over to the adoptive father or mother in the presence of a MOSAVY official. During the Surrogate's Court hearing, a Cambodian attorney and a United States attorney qualified as an expert in adoptions testified on behalf of LMB that a Cambodian adoption can be completed without a handing over ceremony; a Cambodian-American lawyer and the Director of the Child Welfare Department of MOSAVY offered testimony to the contrary.

Under the act of state doctrine, Surrogate's Court should have given deference to the Cambodian government's determinations concerning the adoptive status of its citizen. The doctrine applies where a "suit requires the Court to declare invalid, and thus ineffective . . . the official act of a foreign sovereign" (*W. S. Kirkpatrick & Co. v Environmental Tectonics Corp., Int'l*, 493 US 400, 405 [1990]). Previously described as resting primarily on principles of international comity and expediency, the Supreme Court has more recently characterized

---

* No appeal has been taken from that order.

the doctrine as a "consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs" (*id.* at 404, quoting *Banco Nacional de Cuba v Sabbatino*, 376 US 398, 423 [1964]). Also underpinning the doctrine is the notion that the judiciary, which by its nature depends on the fortuitous presentation of cases to it, must be careful not to embarrass the executive (political) branch in its more encompassing international negotiations or give offense to a sovereign nation (*see Sabbatino*, 376 US at 431-432).

According to the majority, the Cambodian government was without authority to revoke LMB's adoption (or accept his abandonment of the adoption, or declare that the adoption had never been completed) or grant ERJ permission to adopt John Doe because the infant was not physically within the territory of Cambodia at the time. However, the majority would give effect to the adoption granted LMB, even though John Doe was in New York at that time also. The majority fails to explain why Cambodia had authority to grant an adoption of a child outside its territory but lacked the power to reconsider that decision or express an opinion as to its validity, even when requested by the original grantee. The majority implicitly concedes the point by arguing only that "there is nothing in the record to suggest that Cambodia *ever* revoked LMB's adoption," and that Cambodia should have asked LMB to return the child. However, the MOSAVY letter and the Sor Chor Nor, both contained in the record, do more than "suggest" that LMB's adoption was no longer valid. The need to request a return of the child was obviated by the adoption application by ERJ, *in whose care and physical custody the child had been continuously*. By recognizing LMB's adoption, the majority is conferring act of state doctrine effect to an extraterritorial determination by Cambodia; by refusing to accord equal effect to Cambodia's nullification/ acceptance of renunciation of that adoption and ERJ's adoption, the majority crafts a new rule: a foreign government is allowed one and only one act of state in a matter.

The majority's decision rests primarily on two faulty premises: that the Cambodian government seeks to intervene in New York proceedings and that it changes its mind on a whim. However, Cambodia never attempted to inject itself into United States territory or proceedings, but rather was petitioned by the parties. Specifically, ERJ sought permission to take John Doe to

the United States for medical treatment; LMB asked to adopt the child; LMB requested that Cambodia accept his "relinquish-[ment]" of the adoption; ERJ then petitioned to adopt the child and later sought clarification of the boy's adoptive status. Moreover, "even when an act of a foreign state affects property outside of its territory, 'the considerations underlying the act of state doctrine may still be present' " (*In re Philippine Nat'l. Bank*, 397 F3d 768, 773 [9th Cir 2005], quoting *Callejo v Bancomer, S.A.*, 764 F2d 1101, 1121 n 29 [5th Cir 1985]). "Although the fact that the property is located outside of the foreign state reduces the potential for offense," the doctrine may still be given effect "if doing so is consistent with United States public policy" (*Callejo*, 764 F2d at 1121 n 29). Indeed, the doctrine is a flexible one (*see First Natl. City Bank v Banco Nacional de Cuba*, 406 US 759, 763 [1972]), and it is "evident that some aspects of international law touch much more sharply on national nerves than do others" (*Sabbatino*, 376 US at 428). The determination of the orphan/adoptive status of a country's own citizens can only be viewed as touching sharply on national nerves. Indeed, Surrogate's Court acknowledged that illegal trafficking in orphans is a real danger in Cambodia and was the very reason Sub-Decree No. 29 (requiring a handing over ceremony) was effected. To say, as Surrogate's Court did, that there is no allegation LMB is trafficking in orphans does not eliminate the Cambodian government's interest in deciding whether and by whom its orphans may be adopted. It was not the Cambodian government that, in the words of the majority, "change[d] its mind," rather it was LMB who changed his mind. Far from acting capriciously or leaving the parties "twisting in the wind," as the majority contends, the Cambodian government acted reasonably by accepting LMB's abandonment of the adoption and then, faced with a newly orphaned child, by granting ERJ's request to adopt the boy. The only one to "change [his] mind" and leave others "twisting in the wind" was LMB, who first sought adoption, then relinquished it and agreed to ERJ's adoption, but then opposed her adoption and threatened to accuse her of being an unfit single parent unless a suitable financial settlement was forthcoming, a financial settlement which, remarkably, was not premised upon the needs of the child but, rather, on LMB's ego and his desire to make certain the child "is not directly aware of the vast disparity between the wealth of [LMB] and the wealth of [ERJ]."

Under the majority's construction, even if Cambodia erroneously approved an adoption, either through mistake or fraud, it

would be powerless to speak on the issue once the subject child left the geographical confines of the country. Following the majority's logic, the Cambodian government would lose all authority to comment on the citizenship status of one of its citizens, once such a person left the country's territory. However, a country's "interest in the enforcement of its laws does not always end at its borders" (*Callejo*, 764 F2d at 1121 n 29).

Whether viewed under notions of judicial deference to the executive or international comity, Surrogate's Court should have deferred to the Cambodian government's decrees concerning the status of its citizen, John Doe.

SAXE, J.P., and GONZALEZ, J., concur with CATTERSON, J. NARDELLI, J., dissents in a separate opinion.

Order, Surrogate's Court, New York County, entered October 11, 2007, affirmed, without costs.