[923 NE2d 1129, 896 NYS2d 741]

In the Matter of the Adoption of JOHN DOE, an Infant. LMB, Respondent; ERJ, Appellant.

Argued January 13, 2010; decided February 16, 2010

**POINTS OF COUNSEL**

*Newman & Greenberg,* New York City (*Richard A. Greenberg* and *Steven Y. Yurowitz* of counsel), for appellant. I. The Act of State Doctrine applies to a foreign adoption granted by the highest levels of a foreign government. (*Banco Nacional de Cuba v Sabbatino,* 376 US 398; *F. & H.R. Farman-Farmaian Consulting Engrs. Firm v Harza Eng'g Co.,* 882 F2d 281; *People ex rel. Arcara v Cloud Books,* 68 NY2d 553; *People v P.J. Video,* 68 NY2d 296; *People v Scott,* 79 NY2d 474; *Occidental of Umm al Qaywayn, Inc. v A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis,* 577 F2d 1196; *Callejo v Bancomer, S.A.,* 764 F2d 1101; *In re Philippine Natl. Bank,* 397 F3d 768; *United States v Merritt,* 962 F2d 917; *Galu v Swissair: Swiss Air Transp. Co., Ltd.,* 873 F2d 650.) II. Cambodian law governs the validity of LMB's written relinquishment, conveyed to and accepted by Cambodia, of his Cambodian-granted adoption of a Cambodian orphan-citizen, and under Cambodian law LMB's relinquishment was valid. (*Matter of Hollinger,* 93 Misc 2d 926; *Matter of Female Infant F.,* 191 AD2d 437; *Mountain View Coach Lines v Storms,* 102 AD2d 663; *People v Shakur,* 215 AD2d 184; *Blackmer v United States,* 284 US 421; *Schultz v Boy Scouts of Am.,* 65 NY2d 189; *Anh v Levi,* 586 F2d 625; *Babcock v Jackson,* 12 NY2d 473; *Matter of Crichton,* 20 NY2d 124; *Auten v Auten,* 308 NY 155.) III. A best interest analysis is required in a contested adoption between nonbiological parents, and the Surrogate's failure to consider John Doe's best interests before vacating ERJ's adoption was reversible error. (*Matter of Male Infant L.,* 61 NY2d 420; *Matter of Bennett v Jeffreys,* 40 NY2d 543; *Friederwitzer v Friederwitzer,* 55 NY2d 89; *Matter of Gale v Gray,* 39 AD3d 903; *Matter of Alfredo S. v Nassau County Dept. of Social Servs.,* 172 AD2d 528; *Matter of Hicks v Bridges,* 2 AD2d 335; *Matter of O'Rourke v Kirby,* 54 NY2d 8; *Matter of Kevin G.,* 227 AD2d 622; *Matter of George L. v Commissioner of*

*Fulton County Dept. of Social Servs.,* 194 AD2d 955; *People ex rel. Turner v Hembrooke,* 12 AD3d 966.)

*Cohen Hennessey Bienstock & Rabin P.C.,* New York City (*Bonnie E. Rabin* and *Timothy W. James* of counsel), for respondent. I. New York law governs the MOSAVY letter's effectiveness as a surrender of parental rights. (*Matter of Female Infant F.,* 191 AD2d 437; *Anh v Levi,* 586 F2d 625; *Babcock v Jackson,* 12 NY2d 473; *Indosuez Intl. Fin. v National Reserve Bank,* 98 NY2d 238; *Matter of Crichton,* 20 NY2d 124; *Auten v Auten,* 308 NY 155; *Reale v Herco, Inc.,* 183 AD2d 163; *Merrick v Merrick,* 180 AD2d 546; *McKoan v McKoan,* 15 Misc 3d 1115[A], 2007 NY Slip Op 50653[U]; *Zurich Ins. Co. v Shearson Lehman Hutton,* 84 NY2d 309.) II. The MOSAVY letter did not meet New York law's requirements for an effective surrender of parental rights. (*Dennis T. v Joseph C.,* 82 AD2d 125.) III. The MOSAVY letter would not be a legally effective surrender of LMB's parental rights under Cambodian law. IV. The Act of State Doctrine does not apply. (*Banco Nacional de Cuba v Sabbatino,* 376 US 398; *W. S. Kirkpatrick & Co. v Environmental Tectonics Corp., Int'l,* 493 US 400; *Riggs Natl. Corp. & Subsidiaries v Commissioner of Internal Revenue Serv.,* 163 F3d 1363; *Alfred Dunhill of London, Inc. v Republic of Cuba,* 425 US 682; *Republic of Philippines v Marcos,* 806 F2d 344; *In re Grand Jury Proceedings Bank of Nova Scotia,* 740 F2d 817; *Timberlane Lbr. Co. v Bank of Am., N.T. & S.A.,* 549 F2d 597; *United States v Evans,* 667 F Supp 974; *Matter of Jarrett,* 230 AD2d 513; *Morrison v Budget Rent A Car Sys.,* 230 AD2d 253.) V. No best interests hearing was required or appropriate. (*Matter of Bennett v Jeffreys,* 40 NY2d 543; *Matter of Male Infant L.,* 61 NY2d 420; *Carpenter v Buffalo Gen. Elec. Co.,* 213 NY 101; *Matter of Upjohn,* 304 NY 366; *Matter of Robert Paul P.,* 63 NY2d 233.)

### OPINION OF THE COURT

Smith, J.

The parties to this proceeding are former lovers who never married but who, while they were romantically involved, brought a Cambodian child to the United States, and planned to adopt him together. The adoption proceedings became complicated; the couple broke up; and now each claims to be the child's only parent.

Before us on this appeal is an order of the Surrogate, affirmed by the Appellate Division, which granted the petition of LMB, who asserts he is the child's father, to vacate an adoption decree

previously granted to ERJ, who claims the status of mother. We agree with the courts below that the adoption decree must be vacated.

I

Many facts in this case are disputed, but few if any of the factual disputes are material to the legal issues. In the following account, we try to confine ourselves to facts that are agreed on or, at least, asserted by one party and not contradicted by the other.

In January 2003, John Doe, apparently about two months old, was found abandoned in a village market in Cambodia and taken to an orphanage. ERJ, a wealthy New York resident who had taken a philanthropic interest in the plight of Cambodian orphans, saw him for the first time on a tour of the orphanage in June 2003.

LMB, ERJ's then boyfriend, also met John Doe in Cambodia, in July 2003. The child suffered from a heart ailment that could not be properly treated in Cambodia, and in late August or early September 2003 he was brought to New York on a six-month visa (later extended for another six months) for the purpose of receiving medical care. John Doe has lived at ERJ's home in New York City since that time. LMB was, until late 2005, at least a frequent visitor to the home, if not an inhabitant of it. Both parties love the child, and have participated in caring for him.

At some point either before or after the child was brought to the United States, ERJ decided she wanted to adopt him. The parties agreed—either at the outset, or at some later time—that LMB would adopt him also. United States law presented an obstacle to the adoption, or so the parties believed; they understood that the United States had put a moratorium on adoption of Cambodian children, in response to reports of trafficking in Cambodian babies. The parties devised a fairly complicated solution to this problem. LMB, though a United States citizen, was born in Trinidad and Tobago. The plan was that he would reestablish Trinidadian citizenship (which he could do without relinquishing United States citizenship); that he would adopt John Doe in Trinidad and Tobago; and that the child—no longer a Cambodian—could then also be adopted by ERJ in New York.

LMB did reclaim his Trinidadian citizenship, and applied to the Cambodian government for permission to adopt John Doe.

On June 23, 2004, the Cambodian Ministry of Social Affairs, Labor, Vocational Training and Youth Rehabilitation (which later changed its name, and is referred to by its current acronym, MOSAVY), issued a document to LMB approving his request. In the translation submitted by LMB, the document is titled "ADOPTION CERTIFICATE" and says that LMB "is allowed to adopt the orphan child [John Doe]."

The parties' plan to arrange a Trinidadian adoption as a prelude to a New York adoption did not work out. LMB was advised (belatedly, it seems) that single men could not adopt children under Trinidadian law. Meanwhile, in August 2004, the romantic relationship between LMB and ERJ ended, though the two remained, for the time being, on more or less friendly terms.

In the fall of 2004, ERJ was told that it might be possible for her to adopt John Doe in New York after all, even if there was no previous Trinidadian adoption. In an effort to help her accomplish this, on March 14, 2005 LMB signed, at ERJ's request, a letter to MOSAVY saying: "I wish to relinquish the permission that was granted to me by the Kingdom of Cambodia to adopt the orphan child." ERJ made her own application to Cambodian authorities, and on October 11, 2005 MOSAVY issued her a certificate identical in form to the one it had issued to LMB in June 2004. In December 2005, the parties quarreled, apparently because each disapproved of the other's approach to bringing up children, and their relations have been hostile since that time.

On January 12, 2006, ERJ filed a petition with the New York County Surrogate to adopt John Doe. She did not give LMB notice of the adoption proceeding. In her petition, she characterized the relief she sought as "a re-adoption," a characterization she later said was mistaken. ERJ's adoption petition also contained another flaw, one she later called "a very stupid error"; she acknowledged that she "was not candid" with the Surrogate, in that she failed to disclose a recent stay at an alcohol treatment facility.

The New York adoption ERJ sought was not opposed, and was granted on April 12, 2006. On August 1, 2006, LMB, having learned of the adoption, began the present proceeding to vacate it. While this proceeding was pending, the Cambodian government issued two documents that ERJ now relies on. The first, a letter dated October 24, 2006 from MOSAVY to ERJ, states in substance that the Cambodian government validly granted ERJ

permission to adopt John Doe. It adds that LMB "also submitted an application" but "failed to attend a handing over ceremony . . . and he also submitted a letter of refusal to adopt." It authorizes ERJ to "use this letter as you see fit for the best interest of" John Doe.

The second document, dated December 1, 2006, was issued by the Cambodian Council of Ministers and is referred to by the parties as a "Sor Chor Nor"—a phrase translated by ERJ as "governmental edict or clarification of rights." The Sor Chor Nor refers to and repeats the substance of MOSAVY's October 24, 2006 letter, and adds that LMB's "request to adopt this child is considered as null and void."

After a trial in which experts on Cambodian law testified for both sides, the Surrogate, in a lengthy and carefully reasoned decision, granted LMB's petition to vacate the adoption decree. The Appellate Division affirmed, with one Justice dissenting (*Matter of Doe*, 58 AD3d 186 [1st Dept 2008]). The Appellate Division granted leave to appeal to this Court, and we now affirm.

## II

The substance of LMB's argument, which the courts below upheld, is that he became John Doe's father by virtue of the certificate issued to him by MOSAVY on June 23, 2004; that his parental rights have never been effectively relinquished or extinguished; and that therefore ERJ could not adopt John Doe without LMB's consent (*see* Domestic Relations Law § 111 [1] [b] [requiring the consent of parents to the adoption "of a child conceived or born in wedlock"] and [5] [providing that a child "who has once been lawfully adopted may be readopted directly from such child's adoptive parents in the same manner as from its birth parents"]). We do not find it necessary to endorse all of LMB's argument, or all the conclusions reached by the courts below; but we agree with much of their reasoning, and agree that the adoption decree issued to ERJ was correctly vacated.

To explain our conclusion, we discuss five issues: (1) the effect under Cambodian law of the June 23, 2004 certificate; (2) whether comity should be accorded to that certificate under New York law; (3) the effect, if any, of the "relinquishment" letter signed by LMB on March 14, 2005; (4) whether the documents issued by the Cambodian government in 2006 were "acts of state" nullifying LMB's parental rights; and (5) whether the courts below should have considered the best interests of the child in deciding whether to vacate ERJ's adoption.

1. The effect of the June 2004 certificate under Cambodian law

Whether, under Cambodian law, LMB validly adopted John Doe in June 2004 was a major issue below, generating a duel between experts at trial and occupying a large part of the Surrogate's decision. But there is no need for us to examine this question in similar detail here. The Surrogate concluded that, under Cambodian law, the June 2004 certificate evidenced not just "permission to adopt" but a "full and final adoption"; and that neither LMB's failure to participate in a "giving and receiving ceremony" nor the absence of approval of the adoption from Trinidad and Tobago altered the Cambodian-law effect of the adoption. We find the Surrogate's reasoning on these issues to be compelling, and ERJ has not challenged the Surrogate's resolution of the Cambodian law question in this Court. We are satisfied that, under Cambodian law, LMB validly adopted John Doe in June 2004.

2. The comity issue

Whether the Cambodian adoption certificate of June 2004 should be given comity by the New York courts—i.e., whether being John Doe's father under Cambodian law made LMB his father under New York law also—is a question that received less attention below, but requires more discussion by us here.

It seems from the Surrogate's opinion that ERJ opposed according comity to LMB's Cambodian adoption solely on the ground that "New York State and Federal public policy" precluded it. In support of this argument, ERJ pointed out that: (1) Cambodian law, unlike New York law and federal immigration regulations, did not require a pre-adoption "investigation by a disinterested person or by an authorized agency" (Domestic Relations Law § 112 [7]) or "home study" (8 CFR 204.3 [e]); and (2) Cambodia did not require approval of an international adoption by the "receiving State," as does the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption (32 ILM 1134 [1993]). The Surrogate had little difficulty in disposing of these arguments. She rejected both of them on the ground that foreign adoptions should generally be accorded comity "unless enforcement would result in the recognition of a transaction which is inherently vicious, wicked or immoral, or shocking to the prevailing moral sense" (quoting *Greschler v Greschler*, 51 NY2d 368, 377 [1980] [internal quotation marks omitted]); and she rejected the second argument on the additional ground that the United States had not ratified the Hague Convention. Again, the reasoning of the

Surrogate on these issues is convincing, and ERJ takes no issue with it on this appeal.

ERJ apparently did not advance, and the Surrogate did not address, a perhaps better reason for denying comity to LMB's Cambodian adoption of John Doe: at the time of that adoption, John Doe and LMB were in New York, not Cambodia. It is true that the child was a Cambodian citizen, and that his presence in New York was theoretically temporary; he was here on a visa, originally granted for six months and extended for another six months, for the purpose of receiving medical treatment. On the other hand, it is a reasonable inference from the record that, as of June 2004, John Doe was highly unlikely ever to return to live in Cambodia. On these facts, it is not self-evident that New York should defer to Cambodia to decide the question of whether John Doe should be adopted, or by whom; arguably, as of June 2004, New York's interest in that subject was not less than Cambodia's (cf. Barry E. v Ingraham, 43 NY2d 87 [1977]).

Since ERJ has not made this argument, we need not accept or reject it, and our opinion should not be taken as expressing any view on it. We add, however, that even if the argument had been made and accepted, it might not have altered the outcome of this case. To say that a New York court would not automatically accord comity to the June 2004 Cambodian adoption is not to say that that adoption is necessarily a nullity. ERJ treated it as a nullity when she petitioned the Surrogate for the adoption of John Doe in January 2006. She gave no notice of the proceeding to LMB, and she apparently did not inform the Surrogate that the June 2004 adoption had ever happened. It would be no great stretch to say that Cambodia's determination, in June 2004, of the status of its own citizen was entitled to more respect than this—that ERJ should not have been allowed to adopt John Doe without notice to the person who was John Doe's father under Cambodian law.

3. The March 2005 letter

For the reasons we have explained, the Surrogate and the Appellate Division were correct to hold, for purposes of this proceeding, that LMB became John Doe's father in June 2004, not only under the law of Cambodia but also under the law of New York. Under Domestic Relations Law § 111 (1) (b) and (5), ERJ could not adopt John Doe without the consent of his existing parent. The next question is whether LMB effectively gave that consent in March 2005, by signing a letter saying that he

wished to relinquish the permission to adopt John Doe that the Cambodian government had granted him. We agree with the courts below that no effective consent was given.

Domestic Relations Law § 115-b provides two methods by which a parent may consent to a private-placement adoption (i.e., an adoption other than through an authorized agency) of his or her child. Section 115-b (2) (a) says that such a consent "may be executed or acknowledged before any judge or surrogate in this state having jurisdiction over adoption proceedings." All consents not given before a judge or surrogate are subject to the formal requirements of section 115-b (4), which requires, among other things, a statement "in conspicuous print of at least eighteen point type" of the name and address of the court in which an adoption proceeding has been or is to be commenced (§ 115-b [4] [a] [i]); an equally conspicuous description of the consenting parent's right to revoke his or her consent (§ 115-b [4] [a] [ii]); and execution or acknowledgment of the consent before a notary public or another officer (Domestic Relations Law § 115-b [4] [b]). It is undisputed that the March 2005 relinquishment letter does not meet the requirements of Domestic Relations Law § 115-b.

■ ERJ does not defend the validity of the relinquishment under New York law. Her sole argument on this issue is that Cambodian law should govern the question. She cites no authority supporting this suggestion, and we reject it. It may be debatable, as we explained above, whether parental rights *created* by a Cambodian adoption should, under circumstances like these, be treated as valid in New York. But once parental rights have been validly established under New York law, between an adoptive parent and child who continue to live in New York, the choice of law governing the parental relationship is much less difficult: New York law applies.

Under established conflict of laws principles, the applicable law should be that of "the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation" (*Babcock v Jackson*, 12 NY2d 473, 481 [1963]). New York's interest in a parent-child relationship between two of its residents is plainly greater than the interest of Cambodia in a relationship between an adult who never lived in Cambodia and a child who, with the approval of the Cambodian government, has been adopted by a non-Cambodian and taken to live elsewhere. When New York parents have acquired, by virtue of a foreign country

adoption, parental rights that are recognized in New York, those rights can no longer depend upon the vagaries of a foreign country's law. The rule ERJ seeks would create unacceptable uncertainty for every New York parent raising a child he or she has adopted in a foreign country.

4. The Act of State Doctrine

██ ERJ's main argument on this appeal is that two Cambodian documents issued during the course of the litigation—the MOSAVY letter of October 24, 2006 and the Sor Chor Nor of December 1, 2006—are "acts of state" of the Cambodian government, which must be respected by United States courts and control the outcome of this litigation. This argument lacks merit.

The Act of State Doctrine is that "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory" (*Banco Nacional de Cuba v Sabbatino*, 376 US 398, 416 [1964]). The inapplicability of this doctrine to the present case seems obvious. Assuming that the MOSAVY letter and the Sor Chor Nor were acts of the Cambodian government, and that they purported to terminate LMB's parental rights over John Doe, and to authorize ERJ to adopt him, they certainly were not acts "done within [Cambodia's] own territory." All three of the people that these supposed governmental acts would have affected—LMB, ERJ and John Doe—were living in New York in 2006.

ERJ points out that courts have made exceptions to the territoriality limitation on the Act of State Doctrine (*see Callejo. v Bancomer, S.A.*, 764 F2d 1101, 1121 n 29 [5th Cir 1985]). But the exceptions are rare. The only examples that have been called to our attention involve international banking transactions of exceptional political sensitivity (*United States v Belmont*, 301 US 324 [1937]; *In re Philippine Natl. Bank*, 397 F3d 768, 773 [9th Cir 2005]). ERJ suggests no persuasive reason why this case should be added to the list of exceptions, and there are excellent reasons why it should not be. In the previous section of this opinion, we held that the continued existence of a parent-child relationship between two New York residents should be governed by New York law, because the contrary rule would subject New York parents to intolerable uncertainty. A fortiori, parents living in New York with their adopted children should not run the risk that those adoptions can be nullified by the decree of a foreign government.

5. The best interests of the child

ERJ's claim that the courts below erred in failing to consider whether it would be in John Doe's best interests for ERJ to adopt him misconceives the grounds for their rulings.

The Surrogate vacated ERJ's adoption of John Doe, and the Appellate Division affirmed the Surrogate's order, because that adoption was gravely flawed as a matter of law. Their decision rested, as does ours, on the failure to give notice to or obtain the consent of LMB, who for purposes of this proceeding must be considered John Doe's father. Other flaws in the adoption might have compelled the same result: ERJ's adoption petition represented that she sought a "re-adoption"—a claim that she later disavowed—and failed to disclose a recent substance abuse problem.

The best interests of a child, important though they are, do not automatically validate an otherwise illegal adoption. In particular, the parental rights of a child's father cannot simply be ignored because a court thinks it would be in the child's best interests to be adopted by someone else. The courts below were clearly correct in declining to hold the best interests of the child to be dispositive in this case.

Of course we do not imply that we are indifferent, or that we believe the lower courts were or should be indifferent, to John Doe's best interests. For all the legal complexities in this case, no one dealing with it can forget that its subject is a child, now seven years old, and that that child has lived for virtually his whole life with ERJ, who he no doubt thinks is his mother.

LMB assured the courts below, and has assured us, that his own first concern is John Doe's best interests, and that he has no intention of removing the child from the only home he has ever known. Indeed, LMB's brief in this Court says that if ERJ accepts his status as father, he is still willing to agree to a second-parent adoption by ERJ. LMB does maintain that, as John Doe's father and only legal parent, he is legally free to prevent the boy's adoption by ERJ, and to remove him from ERJ's home, if he wants to. But since he says he does not want to, neither we nor the courts below have had any occasion to decide whether LMB's rights are as extensive as he claims. That question is academic, and we hope it will remain so.

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, READ, PIGOTT and JONES concur.

Order affirmed, etc.