*359 OPINION OF THE COURT
Kristin Booth Glen, S.
This uncontested application for the adoption of a nine-year-old child named William presents a question of apparent first impression: whether a functioning second parent has standing under Domestic Relations Law § 110 to adopt him where petitioner and William’s adoptive father are not married, do not live together, have never had a spousal relationship, and are not currently “unmarried intimate partners.” For the reasons below, this court finds that petitioner does have standing under section 110 and may therefore seek to adopt the child.
Facts
The “family” in this case has a complicated and litigious history, much of which is set forth in prior decisions of this court and the appellate courts that have reviewed those decisions.[1] Briefly, petitioner ERJ and LMB had a romantic relationship which led them to desire to adopt a child together. ERJ was active in charitable pursuits in Cambodia, and while there located an orphaned boy, Chan, the subject of the current proceeding.
At the time, the United States had a moratorium on adoption of Cambodian children, so the only way for Chan to enter the U.S. was through a humanitarian visa based on alleged medical problems. Once here, ERJ and LMB tried several schemes to have LMB adopt the child through his alleged membership in an Indian tribe, or in Trinidad and Tobago, where LMB was born, and which citizenship he re-obtained in efforts to avoid the U.S. moratorium. During this time, Chan, now called William, lived with ERJ where he was cared for by a nanny who had raised ERJ’s other, biological children. LMB was a constant visitor, was acknowledged as William’s father, and he and his family were very much a part of William’s life.
Unfortunately, the relationship between ERJ and LMB soured, and after some time she cut off LMB’s contact with William. In early 2006 she petitioned this court to “readopt” Wil *360 liam, based on what she stated was her earlier Cambodian adoption. LMB was not given notice, did not appear, and the adoption was granted in April 2006 in routine manner. When LMB subsequently learned of the adoption, he brought a proceeding to vacate it on the ground, inter alia, that he had validly adopted William in Cambodia, that his alleged renunciation of that adoption was invalid because it did not comply with the requirements of New York law, and that ERJ’s subsequent Cambodian adoption and New York readoption were, therefore, void.
ERJ then took the position, contrary to her readoption petition, that Cambodia does not grant binding and final adoptions, but, rather, only permission to adopt in a foreign country, here, the U.S. As such, she claimed, LMB had never validly adopted William, thus entitling him to no relief. A written battle of experts on Cambodian law ensued, with LMB’s experts, not surprisingly, taking an opposite position. As the dispute could not be resolved on papers, this court held a 13-day trial on Cambodian law which resulted in findings that
(a) William, a Cambodian orphan, was validly adopted by LMB under Cambodian law in June 2004;
(b) the Cambodian adoption should be accorded comity;
(c) LMB was, therefore, William’s legal father; and
(d) ERJ’s adoption of William was vacated, as fatally flawed because LMB’s rights were never effectively relinquished; thus, adoption by ERJ could not take place in the absence of notice to, and consent by, LMB.
During this entire period, from the end of 2005 through the decision vacating ERJ’s adoption in October 2007, ERJ denied LMB any contact with William. After the decision, this court was appointed an Acting Justice of the Supreme Court to deal with matters of custody and visitation during the appellate process. Over time, and with the assistance of a child psychologist, LMB was re-introduced into William’s life, although William’s primary residence continued, as it has to this day, with ERJ. Throughout this entire period LMB was steadfast in this willingness to treat and acknowledge ERJ as William’s mother and to enter into a second-parent adoption with her, if permitted by law.
After the Court of Appeals’ affirmance, ERJ finally began negotiations with LMB in earnest. By this time the situation was much like that of two divorced parents, with one, ERJ, having primary residential custody, but with both sharing, however *361 uncomfortably at times, decision-making authority, and with LMB fully involved with William’s life. In October 2011, the parties entered into a joint parenting agreement which recites, inter alia:
“[E]ach of the parties feels great parental love for William . . .
“William has resided in the home of [ERJ] continuously since September 2003 and considers [ERJ] to be his mother, and she considers William to be her son . . .
“[I]t has been judicially determined . . . that [LMB] adopted William under the law of Cambodia . . . and is . . . his legal father . . .
“William knows that [LMB] is his father . . .
“[T]he parties now wish to place the litigation between them over the past years behind them, to heal the wounds caused by that litigation to the extent that they can, to provide to William the security and other benefits that come with having two loving parents, and to parent William jointly from this time forward with a commitment to serving his best interests . . .
“The parties [hereafter] set forth the rights and obligations of each and the manner in which they will conduct themselves with respect to each other and William in a manner that takes cognizance of the paramount importance of William’s welfare and well-being; [and that will] preserve filial love, affection and respect by William for each of them . . .
“[LMB] shall consent to a second-parent adoption of William by [ERJ] . . .
“Promptly upon finalization of a second-parent adoption . . . the parties shall cooperate . . . and shall take such action as is necessary to enable William to become a permanent resident and, ultimately, a citizen of the United States as soon as is feasible.”
Accordingly, LMB has now petitioned to readopt his son, William,[2] and ERJ has petitioned for a second-parent adoption with a signed consent by LMB. The question of her standing to adopt is thus squarely presented.
*362 Discussion
Domestic Relations Law § 110 states in pertinent part: “An adult unmarried person, an adult married couple together, or any two unmarried adult intimate partners together may adopt another person.” While the statutory text neither authorizes nor prohibits the adoption of a child by two unmarried individuals, in 1995 the Court of Appeals settled the question of whether unmarried couples are barred under all circumstances from adopting under the statute, holding that an unmarried partner of a biological parent has standing to adopt the child they are raising together (Matter of Jacob, 86 NY2d 651 [1995]).[3] In so holding, the Court advised that while the language of New York’s adoption statute must be strictly construed, it must also be interpreted in accordance with the statute’s legislative purpose: to effect the best interests of the child. As stated by the Court: “[T]he adoption statute must be applied in harmony with the humanitarian principle that adoption is a means of securing the best possible home for a child” (id. at 657-658).
In measuring the child’s best interests, the Court of Appeals examined the economic and emotional benefits that a so-called “second-parent” adoption would offer a child. The Court observed that such an adoption would provide a child with emotional security because in the event of the existing parent’s death or disability, or in the event of the parents’ separation, the second parent is legally entitled to continue her parental role. In the absence of adoption, the second parent would have no right of visitation with the child regardless of whether denial of that right would cause the child significant emotional harm (see Matter of Alison D. v Virginia M., 77 NY2d 651 [1991]). The Court further noted that a second-parent adoption bestows upon two parents legal responsibility for making important decisions in the child’s life, including medical decisions in the event of an emergency (Matter of Jacob, 86 NY2d at 658-659).
Further, the Court observed, numerous economic benefits flow from the second parent to the adoptive child. Adoption confers upon the second parent a legal obligation to support the child. Tangible benefits accruing from such an adoption may also include Social Security and life insurance benefits in the event of the adoptive parent’s death or disability, the right to sue for wrongful death of a parent, a right of inheritance under *363 intestacy laws, and eligibility for health care coverage (id. at 658).
Analyzing the text of the predecessor to the current version of Domestic Relations Law § 110, the Court of Appeals rejected the suggestion that the word “together” as it appears after the words “an adult husband and his adult wife” applies to bar adoption by an unmarried person in a relationship with another.[4] Rather, the Court concluded, the statute prohibits only married persons in intact marriages from adopting without their spouse’s knowledge and consent. In so concluding, the Court expressed concern that a more expansive reading of the term “together” would foreclose whole classes of adoptive parents not before the Court — including “two unmarried adults seek-ting] to adopt a child who is the biological child of neither of them” — from adopting (Matter of Jacob, 86 NY2d at 660 n 3).
To further support its conclusion that section 110 confers standing to adopt upon an unmarried second parent, the Court observed that recent amendments to the statute had worked to expand the categories of married persons entitled to adopt to include, for example, adults living apart from their spouses under separation agreements or judgments and adults living apart from their spouses for a period of time. This successive expansion of the class of persons with standing to adopt, the Court reasoned, reflected the legislature’s recognition of the changing composition of the family and its desire to encourage “the adoption of as many children as possible regardless of the . . . marital status of the individuals seeking to adopt them” (id. at 662).
Finally, the Court concluded that Domestic Relations Law § 117 (1) (a) — which states that “[a]fter the making of an order of adoption the birth parents of the adoptive child shall be relieved of all parental duties toward and of all responsibilities for and shall have no rights over such adoptive child or to his property by descent or succession” — did not present a bar to a second-parent adoption. Reasoning that section 117 is concerned not with standing to adopt, but rather with the effect of the adoption on the parties’ inheritance and property rights, the Court held that section 117 did not cut off the rights of the existing parent upon the adoption of the child by the second parent.
*364 Subsequent cases, relying upon the Court of Appeals’ analysis in Matter of Jacob, have interpreted section 110 in a manner that further expands the class of persons who may adopt. While the standing of an unmarried couple to file a joint petition to adopt a child biologically unrelated to either party was not before the Court of Appeals, New York courts have since conferred standing upon unmarried joint petitioners without any biological tie to the child (Matter of Carolyn B., 6 AD3d 67 [4th Dept 2004]; Matter of Carl, 184 Misc 2d 646 [Fam Ct, Queens County 2000]; Matter of Joseph, 179 Misc 2d 485 [Sur Ct, Oneida County 1998]), as well as upon joint petitioners with a remote biological tie (Matter of Emilio R., 293 AD2d 27 [1st Dept 2002]). And, in 2010, the legislature amended section 110 to specifically include “unmarried adult intimate partners” “to both codify and broaden the ability of domestic partners to undertake a joint adoption” (Scheinkman, 2011 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law C110:4, 2012 Pocket Part at 8; L 2010, ch 509, § 1 [eff Sept. 17, 2010]).
Under the law as it currently exists, then, there is no question that an adult unmarried person has standing to adopt under the plain language of section 110. Furthermore, there is no question that an adult partner of a child’s biological parent has standing to adopt the child under the Court of Appeals’ ruling in Matter of Jacob. There is also little question under Matter of Jacob and its progeny that an adult partner of a child’s adoptive parent has standing to adopt (see Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law C110:4 at 64 [“there would seem to be no reason why, under Matter of Jacob, (a) second parent could not adopt the adoptive child of his or her unmarried partner”]). And, with the 2010 amendment to the statute — at a time when New York did not yet permit same-sex marriage — there is no question that unmarried persons, regardless of their gender, who are “intimate partners,” can adopt together. The question remains, however, whether an adult unmarried person has standing to petition to become the second parent of a previously adopted child where petitioner and the adoptive father of the child do not reside together and, in fact, have never had a spousal relationship, and are not currently “unmarried intimate partners.”
The limited issue of petitioner’s standing could be determined based on the plain language of the statute with the only inquiry *365 whether petitioner is an unmarried adult. As stated in Matter of Jacob:
“Domestic Relations Law § 110, entitled ‘Who May Adopt,’ provides that an ‘adult unmarried person or an adult husband and his adult wife together may adopt another person’ .... Under this language, both appellant G.M. in Matter of Dana and appellant Stephen T.K. in Matter of Jacob, as adult unmarried persons, have standing to adopt and appellants are correct that the Court’s analysis of section 110 could appropriately end here” (86 NY2d at 660).[5]
Following the Court of Appeals’ example, however, the better course is to examine the plain language of the statute in light of the clear legislative purpose of serving the best interest of the child.
In the case of this second-parent adoption, the issue is not whether a child such as William would be better off with two parents who are legally committed to one another as well as to him. Rather than judging William’s best interests against the measure of a “perfect” family arrangement, the court must instead take this child and his family as it finds them. As is the case with all second-parent adoptions, William already has one legally recognized parent, albeit that parent has agreed that William’s primary residence is, and has been, with petitioner. The question for William, therefore, is limited to whether he will continue to be the child of his adoptive father alone, or instead will be the legal child of both of the unmarried adults who are raising him.
Analysis of legislative intent as it applies to this particular family arrangement begins with the Court of Appeals’ observation that the legislature’s intention to serve the child’s best interest is furthered by “allowing two adults who actually function as a child’s parents to become the child’s legal parents” (Matter of Jacob, 86 NY2d 651, 658 [1995]). In this case, ERJ has been the most consistent and stable presence in the child’s life for more than eight years. Regardless of how her role as primary caretaker came about, she has consistently been either the sole person, or for the last four years, one of two persons *366 upon whom William has relied, not only to meet his physical needs, but also to fulfill his emotional needs and provide him with parental love and support. ERJ is, in every conceivable sense, a functioning parent to this child, and has been virtually all of his life.
Granting or denying ERJ’s application to adopt will engender no change in day-to-day life as this child now knows it. ERJ will continue, regardless of the outcome, to be the only mother William has ever known. She will continue to be the primary custodial caregiver and advise and guide him — along with his father — in making life’s decisions, large and small. Determining that petitioner has standing to adopt will, however, confer upon William the very same emotional and economic advantages identified by the Court of Appeals as furthering the legislative purpose of section 110. Indeed, adoption will offer such a child numerous economic benefits, including the significant right of financial support from both of his parents,[6] as well as a host of benefits ranging from rights in intestacy to Social Security payments in the event of petitioner’s death or disability. It will also confer upon William, as the Court of Appeals pointed out, the right to be raised by his remaining legal parent in the event of his father’s death or disability, and the right to visitation with the noncustodial parent in the unfortunate event of another family fissure. In short, William will have the security of knowing that his relationship with both parents is valued and protected under the law.
There is one additional benefit that will flow to William almost immediately as a result of ERJ’s adoption of him. Because he was brought to this country on a medical (humanitarian) visa, long since expired, William’s immigration status is, at best, tenuous.[7] Under current immigration law, upon her second-parent adoption, ERJ will be able to apply for permanent resident alien status for William, a status which can, in *367 time, be transformed to provide him with U.S. citizenship and which also provides him with immediate benefits.[8]
According to ERJ, William has been accepted at a private school in New York contingent upon his obtaining legalization of his immigration status, so this adoption will also permit him to attend the school of his and his parents’ choice. In addition, William will be able to travel outside the country with ERJ and her other children.
It is true that the lack of a spousal relationship or an “intimate partnership” between petitioner and the child’s father distinguishes this family from the families before the Court in Matter of Jacob. But where, as here, a petitioner has been a functional co-parent for virtually a child’s entire life, that child is no less in need of the legal protections offered by adoption simply because his parents do not also function as a spousal unit.
The majority of the Court in Matter of Jacob, in rejecting the dissent’s position that the New York Legislature intended standing under section 110 to be limited to single persons and married couples, also rejected the dissent’s underlying concern that two persons with no legal ties to one another pose an unacceptable risk of instability because they can walk away from one other at any time “with impunity” (Matter of Jacob, 86 NY2d 651, 673 [1995]). The 2010 amendment, granting standing to unmarried persons in an intimate relationship, similarly rejects this concern. The relationship among ERJ, William, and the child’s adoptive father, LMB, has, in this case, strengthened over time as the bitterness of their earlier litigation has receded and they have entered into a binding co-parenting agreement.
Because this parental relationship, unlike those in Matter of Jacob, has no spousal component, any future romantic relationships that William’s parents may choose to have with third parties need not displace the contractual bond ERJ and LMB have formed between themselves. That is, the parties here have already provided against what the dissent in Matter of Jacob *368 feared — a “divorce,” with both parents going their separate ways — by ensuring that each will continue to cooperate with the other in raising William in a way most consistent with his best interests.
While logistical difficulties are no doubt posed by the fact that family members span two separate households, such difficulties make this no less of a functioning, loving, stable family unit for William. If the legislature’s goal is to ensure that children such as William are placed in permanent, stable families, that goal is no less attained here than it was in Matter of Jacob. At any rate, refusal to permit adoption of a child either by an unmarried couple or by two unmarried individuals serving as the child’s parents would pose a much graver threat to the stability of family life: it would permit the child’s psychological parent to walk away from the child with impugnity, in direct contravention of the legislative mandate to serve the child’s best interest.
The relevant statutory text must next be considered against the backdrop of this best interest analysis. Just as the language of section 110 does not require that couples be married to adopt a child (Matter of Jacob, 86 NY2d 651 [1995]), likewise the plain language of the statute does not mandate the existence of a spousal-type relationship between the adoptive parents. The same analysis applies to the 2010 amendment which added “two adult unmarried intimate partners.” Nor does the statute require that a putative adoptive parent live with the child (see Matter of A.J.J., 108 Misc 2d 657 [Sur Ct, NY County 1981] [court granted adoption by unmarried biological father who lived separate and apart from child and biological mother]).
Neither is it necessary that the parent and prospective adoptive parent ever live together. While Domestic Relations Law § 112 (6) — made applicable to private adoptions such as this through Domestic Relations Law § 115 (1) — directs that an order of adoption shall not be entered for a minor child until the child has resided with the adoptive parents for a period of three months, the statute grants the court discretion to dispense with the residency requirement for good cause. This residency requirement does not reflect a legislative mandate that family members live together in all cases, but rather seeks to ensure that familial bonds are forming satisfactorily and that all parties are adjusting to their new lives together before legal rights and obligations are imposed (see Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 112). There is no doubt in this case of the *369 strong bond between ERJ and William, and the mutual obligations she and LMB have assumed. In addition, the parties clearly have had sufficient time to assess the significance of the legal commitment ERJ seeks to undertake.
It should be noted that this decision does not open the door to adoptions by all manner of petitioning parties as the dissent in Matter of Jacob worried (Matter of Jacob, 86 NY2d at 672-673). Answering this charge, the majority observed that only second-parent adoptions were before it, and further noted that the Court’s decision did not require approval of all second-parent adoptions, but simply allowed courts to approve adoptions “when appropriate” (id. at 667 n 4). In other words, this decision conferring standing to petition for adoption on a single “functional parent” who is not in an intimate relationship with the child’s adoptive parent is not the end of the story.
Once standing is found to exist, courts are still bound to make a further determination as to whether adoption will serve a child’s best interest. It may be that in some cases, a court’s best interest analysis will lead it to conclude that adoption by a petitioner who does not live with the child and is not romantically involved with the child’s legal parent will not serve her or his best interest, even as adoption by a married couple might not. That such a conclusion may ultimately be reached by a given court in a given case does not, however, affect the analysis of whether standing exists in the first instance. Based upon the same considerations identified by the Court of Appeals in Matter of Jacob, this court concludes that, as a “functional parent,” ERJ has standing under section 110 to seek to adopt William. This holding has also been implicitly approved by Court of Appeals’ apparently favorable notice that, with regard to William’s best interest, “LMB is still willing to agree to a second-parent adoption by ERJ” (Matter of Doe, 14 NY3d at 111). The adoption shall proceed accordingly.

. The first reported decision was on petitioner’s motion to close the courtroom and seal the record in the hearing on Cambodian law (Matter of Doe, 16 Misc 3d 714 [Sur Ct, NY County 2007]). The 100-page posttrial decision vacating ERJ’s adoption, and finding that LMB had legally adopted William in Cambodia, was originally sealed but subsequently made public (Oct. 11, 2007 decision and order). That decision was affirmed by the Appellate Division (Matter of Doe, 58 AD3d 186 [1st Dept 2008]), and the Court of Appeals subsequently affirmed (14 NY3d 100 [2010]).

. While not necessary to secure any legal rights, readoption here in New York permits the issuance of a new birth certificate showing LMB as William’s father.

. The Court was interpreting a prior version of the statute, before its amendment in 2010 to add any two unmarried “adult intimate partners” to the persons eligible to adopt, as discussed below.

. The legislature’s replacement in 2010 of the phrase “an adult husband and his adult wife” in section 110 with “an adult married couple” does not change the analysis.

. The 2010 addition to the statute of “any two unmarried intimate partners together” does not change this analysis, and the discussion of the nonlimiting effect of the word “together” in Matter of Jacob also supports the conclusion reached here.

. This is not to say, however, that petitioner has some special entitlement by virtue of her admittedly great wealth. Rather, that like any other child, William is better served by having two parents upon whom he can rely for financial support, despite the disparity in their means.

. As described in detail in a prior decision of this court, and mentioned above, William came to this country at a time when the United States had imposed a moratorium on adoption of Cambodian children such that no ordinary immigration visas would be granted to such children.

. As the adoptive mother and primary custodial parent, ERJ (unlike LMB, with whom William does not live) will be able to file an 1-130 petition as anticipated by the parties’ co-parenting agreement described above. Such a petition must be supported by an adoption decree from the foreign country, an adoption decree from the United States, and continuous residence in the United States with the custodial adoptive parent for two years. Once the child is granted permanent resident status, he may then be eligible to obtain U.S. citizenship (U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, http://www.uscis.gov [accessed July 9, 2012]).