*814 OPINION OF THE COURT
Rita M. Mella, S.
In this uncontested second-parent adoption proceeding, the court is faced with an interesting question: may two close personal friends, who together decided to adopt and have jointly participated in all aspects of the adoption process, and have been, in fact, raising a child together, be her joint, legal adoptive parents? For the reasons to follow, the answer is yes.[1]
Relevant Facts
KAL and LEL met in 2000 and quickly became friends. They worked together for a number of years and their friendship deepened with time. Because LEL was a very close friend, KAL confided in him, telling him of her plans to become a mother using artificial insemination. LEL offered to be the father, rather than having KAL use an anonymous sperm donor and then be a single parent. KAL agreed. After two years of trying to conceive a child, including a round of unsuccessful in vitro fertilization, KAL and LEL decided to instead adopt a child together.[2]
KAL and LEL researched adoption options and together selected Ethiopia as the country of origin for their child. They spent years planning and hoping, when they finally received the call in 2011 that a child was waiting to be adopted. KAL and LEL traveled together to Ethiopia to meet G. for the first time. They then made a second trip to bring G. home to New York. Because KAL and LEL were not married to each other, they could not adopt G. together in Ethiopia, so KAL alone adopted her.
Upon returning to the United States, KAL registered the. foreign adoption in Family Court in Kings County, New York. LEL then petitioned this court to adopt G. and become her second legal parent. KAL executed a consent to the relief sought in the petition, so long as the adoption does not extinguish any of her parental rights and only if such adoption results in joint custody.
From the moment they met G., more than two years ago now, KAL and LEL have functioned as her parents. KAL and LEL *815 consider themselves G.’s co-parents and G. knows them as her parents. G. calls KAL “Mommy” and LEL “Daddy.” G.’s legal surname is the last names of both KAL and LEL, hyphenated.
KAL and LEL, although they live in separate households, have created a nurturing family environment for G., including a well thought-out, discussed, and fluid method of sharing parenting responsibilities between their homes. G. spends time each week in both her homes: KAL’s house in Brooklyn and LEL’s apartment in Manhattan. During the week, G. is in day care near KAL’s workplace and LEL’s apartment. Depending on their schedules, KAL and LEL take turns caring for G. or get together for meals and activities. KAL and LEL speak by phone daily to coordinate schedules but mostly to update each other on their experiences with G. G. speaks with both parents each day as well. KAL and LEL consult with each other regularly on issues related to G.’s development, nurturing, and discipline. They support each other in their shared experience of parenting G.
KAL, LEL, and G. also spend much time together as a family. This extends to time with G.’s grandparents — KAL’s and LEL’s respective parents. For example, when KAL’s parents were in town everyone went out to dinner together and then to LEL’s apartment for dessert. Additionally, KAL has traveled with LEL and G. to visit LEL’s family, and stayed in their farmhouse together. KAL and LEL enjoy their time with G. and each other, maintaining their close friendship in addition to raising G. together.
KAL and LEL report that G. is a good-natured toddler and quick to laugh. She transitions easily and smoothly between her two homes. She also has good relationships with LEL’s domestic partner and KAL’s housemate.
With regard to financial arrangements, KAL and LEL coordinate financial planning for G. KAL and LEL share equally all the costs of caring for her and have set up a joint bank account to cover these expenses. KAL and LEL are already saving for G.’s college education, and G.’s grandparents are also contributing. In addition, KAL and LEL shared equally all of the expenses related to the adoption.
The social worker who conducted the home study of KAL and LEL and their respective homes in connection with this adoption petition concluded that
“[KAL and LEL] present a strong, balanced and *816 committed parenting relationship. Even though their relationship is not based on what many consider a traditional family, they exhibit a love and respect for one another and clearly cherish the family they have created with G[ ] . . . . In the best interests of G[ ], I recommend [LEL] and [KAL] be permitted to proceed with the adoption.”
KAL and LEL say they will continue to co-parent together regardless of the outcome of LEL’s petition to adopt G. as her second parent. But they argue that granting this petition will not only make G.’s future more secure but has benefits for both KAL and LEL as parents. G. would have the security of two legal parents, better health insurance benefits,[3] Social Security benefits in the event LEL becomes disabled or dies, a right to inherit from LEL if he were to die intestate, the option of attending public school in the neighborhood where LEL lives, and the protection of LEL’s being able to make all emergency medical decisions when he is alone with G. LEL would have peace of mind knowing that he has the same legal rights as KAL with regard to raising G. and that he can make decisions when necessary even if KAL were unavailable concerning G.’s health, education, and well-being. KAL would have the security of knowing LEL is legally committed to and responsible for raising and providing for G.
Discussion
In considering an adoption petition, the court engages in a two-part inquiry. First, the court must ascertain whether the petitioner or petitioners are eligible, in other words, have standing, to adopt. (Domestic Relations Law § 110.) Once that threshold question is resolved, the court must determine whether the adoption is in the best interests of the child. (Domestic Relations Law § 114; see Matter of Jacob, 86 NY2d 651 [1995] [after holding that the petitioner had standing to adopt, remanding to Family Court to determine whether the adoption is in the child’s best interests]; see also Matter of Emilio R., 293 AD2d 27 [1st Dept 2002]; Matter of Chan, 37 Misc 3d 358 [Sur Ct, NY County 2012].)
*817 Domestic Relations Law § 110: Who May Adopt
Domestic Relations Law § 110 sets forth the classes of people authorized to adopt another person in New York, including: “[a]n adult unmarried person, an adult married couple together, or any two unmarried adult intimate partners together.” I am persuaded that LEL has standing to adopt and, together with KAL, is eligible to be one of G.’s legal parents.
“Intimate Partners”
A 2010 amendment to section 110 added the class “two unmarried adult intimate partners together” to the list of proposed parents who have standing to adopt. (L 2010, ch 509, § 1 [eff Sept. 17, 2010].) The phrase “intimate partners” is not defined in the statute or elsewhere in the Domestic Relations Law, and thus interpretation of its meaning is necessary.
The court’s role in interpreting a statute is to attempt to ascertain the legislature’s intent and then to construe the statute to effectuate that intent. (Matter of M.B., 6 NY3d 437, 447 [2006]; Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998].) The text of the statute itself is the first place to which courts turn to determine legislative intent because it is the clearest indicator of such intent. (Matter of M.B., 6 NY3d at 447.) Language that is clear and unambiguous in statutes is to be interpreted giving effect to its plain meaning. (Id.; Rosner v Metropolitan Prop. & Liab. Ins. Co., 96 NY2d 475 [2001].) Courts must resort to the natural meaning of the words, for if the words are free from ambiguity, there is no need for construction or to add or take away from that meaning. (See McKinney’s Cons Laws of NY, Book 1, Statutes § 76; Majewski, 91 NY2d at 583.)
It is difficult to identify a definitive plain meaning of “intimate partners,” however, because it is a relatively new phrase, and one of many imprecise terms used to describe relationships along a continuum between “acquaintance” or “friend” and “sexual partner” or “spouse.”[4] The phrase is not *818 defined anywhere in the laws of New York.[5] When defined by other jurisdictions, “intimate partners” encompasses a wide range of individuals, from spouses or persons who cohabitate or have cohabitated (18 USC § 921 [a] [32]); persons who are or were involved in a dating relationship, defined as an association characterized by the expectation of affectional or sexual involvement (Neb Rev Stat § 28-323 [8]); “persons who reside together” (Kan Stat Ann § 60-3102 [b]); persons who are “similarly situated to a spouse” (18 USC § 2266 [7] [B]); and even individuals whose intimacy is to be “determined by the length of the relationship, the type of relationship, and the frequency of interaction” (18 USC § 2266 [7] [A] [i] [II]).[6] This inability to ascertain the “plain meaning” of the actual words used in the Domestic Relations Law compels the court to engage in statutory construction by using the familiar rules or principles established by both the legislature and common law for such construction, but always with the goal of discerning the true legislative intent. {See McKinney’s Cons Laws of NY, Book 1, Statutes § 91; Majewski, 91 NY2d at 584.)
One such rule of construction is that legislative enactments creating a right in derogation of the common law — the adoption statute being one of them — must be strictly construed. (See McKinney’s Cons Laws of NY, Book 1, Statutes § 301; Matter of Jacob, 86 NY2d at 657, quoting Matter of Eaton, 305 NY 162 [1953]; Matter of Ziegler, 82 Misc 346 [Sur Ct, NY County 1913].) In Matter of Jacob (86 NY2d at 658), the Court of Appeals held that this strict construction of the adoption statute requires consideration of — and loyalty to — the legislative purpose for its enactment, the child’s best interests. Relying on this very specific legislative purpose, the Jacob Court read a prior version of section 110 (before its 2010 amendment to add “intimate partners”) broadly to confer standing in second- *819 parent adoptions on the unmarried partner of a child’s biological parent.[7]
To support its broad reading, the Court of Appeals took note of the continuing statutory expansion, since World War II, of the categories of people who may adopt. (Matter of Jacob, 86 NY2d at 661.) This expansion has continued apace since Jacob was decided in 1995. Section 110 has been further amended to broaden the classes of persons eligible to adopt: in 1999, it was amended to make it unlawful to prevent a prospective adoptive parent from adopting solely based on having cancer or any other disease. Like the Jacob Court, the legislative finding leading to this statutory change emphasized the relevance of the statute’s purpose:
“The legislature further finds and declares that neither cancer nor any other specific disease should be an automatic ground to disqualify an otherwise qualified applicant from adopting a child. The legislature further finds that each adoption should be judged upon the best interest of the child based upon the totality of the circumstances” (L 1999, ch 522, § 1 [legislative intent] [emphasis added].)
Acknowledging their obligation to interpret the statute with the child’s best interests in mind, courts have consistently read Domestic Relations Law § 110 in an expansive manner with respect to the class of persons that may adopt. Last year, for instance, this court conferred standing in a second-parent adoption to a petitioner who had been the “functional parent,” but was not at that time living with, nor in a spousal relationship with, the child’s existing legal parent. (Matter of Chan, 37 Misc 3d 358 [2012].) Another court recently approved the adoption of three children by their paternal grandmother and their paternal aunt who, the court found, functioned as a typical two-parent family. (Matter of A., 27 Misc 3d 304 [Fam Ct, Queens County 2010]; but see Matter of Garrett, 17 Misc 3d 414 [Sur Ct, Oneida County 2007] [denying joint petition for adoption by natural mother and her biological brother, for him to become child’s legal father].)
*820 The legislative history of the 2010 amendment to Domestic Relations Law § 110 confirms its purpose was to further expand the categories of persons who may adopt in New York. As set forth in New York State Senator Tom Duane’s introductory memorandum, the amendment is intended to codify the Court of Appeals’ decision in Matter of Jacob. Senator Duane noted that despite that decision, there continued to be confusion about whether New York law permits a joint adoption by unmarried adult couples where neither adult is a biological parent. (Sponsor’s Mem, Bill Jacket, L 2010, ch 509 at 6-7, 2010 McKinney’s Session Laws of NY at 2076.) He further stated, “This can be particularly problematic for couples adopting children overseas where only one parent adopts in the foreign country and the second parent seeks to adopt in New York State” (Sponsor’s Mem, Bill Jacket, L 2010, ch 509 at 6, 2010 McKinney’s Session Laws of NY at 2076), the exact factual situation presented here. Senator Duane added that the amendment would enable children to receive the full benefits provided by both parents, as the Court of Appeals envisioned in Matter of Jacob, including, for example, the right to be eligible for coverage under the health insurance policies of both parents (Sponsor’s Mem, Bill Jacket, L 2010, ch 509 at 7, 2010 McKinney’s Session Laws of NY at 2076).
Gubernatorial approval memoranda are also recognized extrinsic aids employed by courts to assist in statutory construction. (People v Glubo, 5 NY2d 461, 474 [1959]; 97 NY Jur 2d, Statutes § 171.) Governor Paterson, in his memorandum accompanying the approval of the 2010 amendment to Domestic Relations Law § 110 into law, commented about two aspects of the legislation. First, the Governor observed that, although the phrase “intimate partners” is not defined in the language of the amendment, it is defined in other statutes, such as the Criminal Procedure Law, which “provide adequate specificity as to the term’s meaning, and would be looked to by agencies and courts in determining the appropriate construction of this law.” (Governor’s Approval Mem, Bill Jacket, L 2010, ch 509 at 5, 2010 McKinney’s Session Laws of NY at 1515-1516.) The Governor was referring to CPL 530.11, which addresses the procedures for criminal prosecution of family offenses.[8] Although this statute does not define the phrase “intimate partners,” it does define a similar term, “intimate relationship.” It notes that there are “[f]actors the court may consider *821 in determining whether a relationship is an ‘intimate relationship,’ ” including, but not limited to: “the nature or type of relationship, regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship.” (CPL 530.11 [1] [e] [emphasis added].) The statute goes on to specify that “[n]either a casual acquaintance nor ordinary fraternization between two individuals in business or social contexts shall be deemed to constitute an ‘intimate relationship,’ ” but that such a relationship can exist “regardless of whether such persons have lived together at any time.”
Thus, the statute from which Governor Paterson suggested the definition of “intimate partner” could be borrowed does not require that individuals live in the same household or have a sexual relationship in order for their relationship to be considered “intimate.” Likewise, there is no need to read into the adoption statute a requirement that an intimate partner seeking to adopt live with the existing, legal parent of the child or have a sexual relationship with her. (See Matter of Chan, 37 Misc 3d at 363, 368; Matter of Jacob, 86 NY2d at 661.)
The second aspect of the 2010 legislation about which the Governor commented relates to the impact of the amendment. The Governor noted in his memorandum that the amendment to Domestic Relations Law § 110 at the very least clarifies existing law and at most expands it and is not intended to limit or restrict such existing law. He considered the purpose of the amendment very broad: “[therefore, to the extent the law prior to this bill has been, or may be, read to permit any particular individual or individuals to adopt, including individuals who are neither married nor ‘intimate partners,’ there is nothing in this bill that would disturb such a reading.” (Governor’s Approval Mem, Bill Jacket, L 2010, ch 509 at 5, 2010 McKinney’s Session Laws of NY at 1515-1516.)
The legislative history of the 2010 amendment to Domestic Relations Law § 110 thus supports the interpretation of the phrase “intimate partners” to include a relationship such as the one we have here: very close, loving friends, who have an intimate connection, which includes planning for and raising a child together. Indeed, the experience of jointly and intentionally parenting a child is itself of the most intimate nature.[9]
*822 This interpretation of “intimate partners” in the context of eligibility to adopt under Domestic Relations Law § 110 is dictated by the legislative purpose of the statute: that it is in their best interests to provide children with a parental relationship. The legislative intent behind the numerous amendments to the statute, of increasing the classes of persons with standing to adopt, advances that purpose and, consistent with New York’s strong policy of assuring that as many children as possible are adopted, also supports this broader interpretation. (See Matter of Jacob, 86 NY2d at 661, 662.)
Unmarried Person
In the alternative, LEL would have standing to adopt G. as an “adult unmarried person.” (Domestic Relations Law § 110.) The Court of Appeals said as much in Matter of Jacob, and explained that the word “together” in the statute only applies to “married persons” and “does not preclude an unmarried person in a relationship with another unmarried person from adopting.” (See Matter of Jacob, 86 NY2d at 660; see also Matter of Chan, 37 Misc 3d at 364.) Nothing in Jacob suggests that standing is limited to unmarried persons in a romantic relationship with another unmarried person who is the child’s parent, and there is no rationale for excluding unmarried individuals who are committed to raising a child together with another unmarried person from having standing to adopt under Domestic Relations Law § 110.
Finally, conferring standing on LEL under these circumstances would not terminate KAL’s parental rights. “[Domestic Relations Law § ] 117 does not invariably require termination in the situation where the [custodial, legal] parent, having consented to the adoption, has agreed to retain parental rights and to raise the child together with the second parent.” (See Matter of Jacob, 86 NY2d at 666-667.) LEL’s adoption of G. is a beneficial intra-family adoption similar to the adoptions in Jacob. Therefore, for the same reasons, I conclude that Domestic Relations Law § 117 would not terminate KAL’s parental rights and thus does not prevent LEL’s adoption of G. as requested in this petition.
Best Interests of G.
The adoption statute must be applied “in harmony with the humanitarian principle that adoption is a means of securing the *823 best possible home for a child.” (Matter of Jacob, 86 NY2d at 657-658.) Moreover, the best interests standard that guides the courts in adoption cases requires a context-specific review. (See Matter of Chan, 37 Misc 3d at 365 [although prospective parent in a second-parent adoption did not live with existing (adoptive) parent, and they had not been in an intimate relationship for a number of years, strong bond between child and prospective parent and parents’ agreement to co-parent established adoption in best interests of child]; see also Matter of A., 27 Misc 3d 304 [2010] [grandmother and aunt may jointly adopt three children; both petitioners, who are mother and daughter, were committed to each other and to the best interests of the three children who related to both petitioners as their parents]; Matter of A.J.J., 108 Misc 2d 657 [Sur Ct, NY County 1981] [natural father may adopt his out-of-wedlock child even though he was not married to child’s mother and did not live in same household, without terminating mother’s parental rights].)
The social worker who conducted the home study for this adoption, pursuant to Domestic Relations Law §§ 115 (1) (b) and 115-d (4), interviewed both KAL and LEL, visited their homes, and collected the information necessary to make the factual evaluation to determine that it would be in G.’s best interests to have LEL become her legal parent together with KAL. Her evaluation was specific to G., KAL, and LEL. She noted that both LEL and KAL provide for her financially, emotionally, and in every other way parents provide for their children. She found that G. is well cared for by both of her functional parents.
There is little question here that both KAL and LEL individually are qualified to adopt G. as her sole parent. The question then becomes, is it in the best interests of G. to have both KAL and LEL as legal parents, even though they do not have a spousal or romantic relationship, and do not live together?
Historically, there has been an implicit, and often explicit, preference for giving adoptive children homes in nuclear families consisting of parents who are husband and wife. {See e.g. Marten v Thies, 99 Cal App 3d 161, 173, 160 Cal Rptr 57, 63-64 [1979] [recognizing that a now repealed version of California Administrative Code “clearly prefer(red)” two-parent homes, consisting of husband and wife, in placing children for adoption, as well as the “sociological” preference for such families].) This idealized family structure is often referred to as “traditional.” The label “traditional” family for the nuclear, heteronormative *824 family, implying it is the typical family, is a misnomer in any event. The “nuclear family” has not represented the norm for large sections of the population in a long time. (See Troxel v Granville, 530 US 57, 63 [2000] [noting that the demographic changes of the past century make it difficult to speak of an average American family]; see also Moore v East Cleveland, 431 US 494, 508-511 [1977, Brennan, J., concurring].)[10]
Today, nearly one third of children in the United States do not live in a household with their two parents. (See United States Census Bureau, America’s Families and Living Arrangements: 2013, Children [C table series], table C3, Living Arrangements of Children under 18 Years and Marital Status of Parents, by Age, Sex, Race, and Hispanic Origin and Selected Characteristics of the Child for All Children: 2013, available at http://www.census.gov/hhes/families/data/cps2013C.html [accessed Dec. 26, 2013].) Various statutes and court decisions in the family law context already recognize and approve of children being raised in nontraditional families. Children are raised in multiple households as the result of divorce, in families with stepparents in the household, in families formed through assisted reproductive technologies, in families with same-sex co-parents, in single-parent families, in foster families, as well as *825 in households with a variety of family members, such as grandparents, aunts and uncles, or other extended family actively engaged in raising children. Clearly, contemporary society’s understanding of what makes a family is evolving and expanding, as is reflected by the discussion of this concept in popular culture and the media,[11] in the political and policy-making arena, and even in the legal community.[12] As society acknowledges an ever expanding cadre of family compositions, adoption law, as the Court of Appeals in Jacob directed, should not lag behind. To do otherwise would have the effect of withholding the benefits and protections of a legal parent from children without regard for what would be in their best interests.
The policy of looking to the best interests of the child “would certainly be advanced” in G.’s situation by allowing the two adults who actually function as her parents to become her legal parents. (See Matter of Jacob, 86 NY2d at 658; see also Matter of Chan, 37 Misc 3d at 365 [“(T)he issue is not whether a child . . . would be better off with two parents who are legally committed to one another as well as to him. Rather than judging (the child)’s best interests against the measure of a ‘perfect’ family arrangement, the court must instead take this child and his family as it finds them”].) In fact, had G. been the biological child of KAL and LEL, New York would have recognized them *826 as her legal parents, even if they had the same type of relationship they now have. (See n 2, supra.) Denying her the possibility of having two legal parents as a result of a narrow interpretation of the adoption statute would yield an incongruous result and defy reason.
KAL and LEL are two loving adults who are both functioning as G.’s parents and have a relationship with each other built on a solid, decade-plus friendship. Even though LEL and KAL have been raising G., to date, solely KAL has been her legal parent. Granting the present petition serves to recognize that LEL and KAL are together and individually permanently committed to raising G. The court finds that it is clearly in G.’s best interests to have LEL become her legal parent.
Conclusion
As evidenced by this discussion, the court finds that declaring LEL to be G.’s legal co-parent is clearly consistent with the legislative purpose of the adoption statute, fits within the parameters established by Jacob and its progeny, and is in her best interests.

. This court has already granted the instant petition and issued an order of adoption declaring G. to be the lawful child of petitioner, LEL. This opinion explains the court’s reasoning.

. Incidentally, if KAL and LEL’s efforts had resulted in conception, both would have been the legal parents of that child and both would have been listed on the birth certificate upon the filing of an acknowledgment of paternity pursuant to Public Health Law §§ 4135 and 4135-b.

. G. is presently covered by LEL’s employer-provided health insurance plan. Although LEL’s employer was not under any legal obligation to provide coverage for G. at that time, such coverage was approved in good faith once LEL filed this adoption petition and with the expectation that it would be granted.

. See e.g. Center for Disease Control and Prevention, Intimate Partner Violence: Definitions, http://www.cdc.gov/ViolencePrevention/ intimatepartnerviolence/definitions.html (accessed Dec. 27, 2013) (“does not require sexual intimacy”); Ruthann Robson & S. E. Valentine, Lov(h)ers: Lesbians as Intimate Partners and Lesbian Legal Theory, 63 Temp L Rev 511 (1990); Alicia Brokars Kelly, Actualizing Intimate Partnership Theory, 50 Fam Ct Rev 258 (2012); Wikipedia, definition of “Intimate Relationship,” http:// en.wikipedia.org/wiki/Intimate_relationship (accessed Dec. 27, 2013).

. Governor Paterson, in his memorandum approving the 2010 amendment, stated that, although “intimate partners” was not defined in the bill, it was defined in other statutes and that definition could be used as a guide in interpreting the phrase (Governor’s Approval Mem, Bill Jacket, L 2010, ch 509 at 5, 2010 McKinney’s Session Laws of NY at 1515). As discussed infra at 820 et seq., the phrase itself is not defined in any other New York statute, but a similar one, “intimate relationship,” is.

. Every definition uncovered in those other jurisdictions includes within its purview individuals who have a child in common. Thus, the relationship between persons who decide to parent a child together is widely considered an intimate one.

. The Court of Appeals further found that an adoption by the partner of a child’s custodial, legal parent should not have the incongruous effect of an overly rigid and literal interpretation of Domestic Relations Law § 117, one that would suggest that the child’s existing biological or natural parent’s rights would be terminated as an effect of the partner’s adoption. (Matter of Jacob, 86 NY2d at 664-665.)

. Family Court Act § 812 (1) (e), as amended in 2008, contains the same language.

. As previously mentioned, individuals who have a child together are considered “intimate partners” in every jurisdiction that defines the term. *822 (See n 6, supra.) New York, like all other jurisdictions, counts individuals with a child in common among those who have an “intimate relationship.” (See CPL 530.11 [1] [e]; Family Ct Act § 812 [1] [e].)

. See also Jessica R. Feinberg, Friends as Co-Parents, 43 USF L Rev 799, 802 (2009) (“In a number of cultures, both within and outside the United States, community members often come together to raise children, with friends of the biological parents assuming a parental role in the child’s life”); Angela Mae Kupenda, Two Parents are Better than None: Whether Two Single, African American Adults — Who are Not in a Traditional Marriage or a Romantic or Sexual Relationship with Each Other — Should be Allowed to Jointly Adopt and Co-Parent African American Children, 35 U Louisville J Fam L 703 (1996-1997) (discussing long-standing tradition of shared parenting by extended family in African-American communities in the United States); Theresa Glen-non, Binding the Family Ties: A Child Advocacy Perspective on Second-Parent Adoptions, 7 Temp Pol & Civ Rts L Rev 255 (1998); Laura M. Padilla, Single-Parent Latinas on the Margin: Seeking a Room with a View, Meals, and Built-In Community, 13 Wis Women’s LJ 179 (1998); Barbara Bennett Wood-house, From Property to Personhood: A Child-Centered Perspective on Parents’ Rights, 5 Geo J On Fighting Poverty 313 (1998); Angela Mae Kupenda, Angelia L.M. Wallace, Jamie Deon Travis, Brandon Issac Dorsey, Bryant Guy, Aren’t Two Parents Better than None: Contractual and Statutory Basics for a “New” African American Coparenting Joint Adoption Model, 9 Temp Pol & Civ Rts L Rev 59 (1999); Harry D. Krause & David D. Meyer, What Family for the 21st Century?, 50 Ajn J Comp L 101 (2002); Cynthia R. Mabry, Joint and Shared Parenting: Valuing All Families and All Children in the Adoption Process with an Expanded Notion of Family, 17 Am UJ Gender Soc Pol’y & L 659 (2009); Sacha M. Coupet, “Ain’t I a Parent?”: The Exclusion of Kinship Caregivers from the Debate over Expansions of Parenthood, 34 NYU Rev L & Soc Change 595 (2010).

. See Phyllis Korkki, Filling Up an Empty Nest, NY Times, May 15, 2013, § F at 1; Frank Bruni, The Families We Invent, NY Times, Dee. 3, 2013, § A at 27; Co-Parenting without a Relationship, The Ricki Lake Show, air date May 9, 2013; Samantha Schoech, Babycenter Blog, No sex. No marriage. Just kids., http://blogs.babycenter.com/mom_stories/01162011-no-sex-no-marriagejust-kids/ (accessed Dec. 27, 2013).

. For example, in California, on October 4, 2013, Governor Brown approved legislation that amends the California Family Code to allow courts to recognize the rights and responsibilities of more than two legal parents, where failing to do so would be detrimental to the child (2013 Cal Stat, ch 564; California Legislative Information, SB-274 Family law: parentage: child custody and support, http://leginfo.legislature.ca.gov/faces/billNavClient .xhtml?bill_id=201320140SB274 & search_keywords= [accessed Dec. 27, 2013]; see also ABA Center on Children and the Law, Joint and Second Parent Adoptions [Aug. 2003], available at http://www.americanbar.org/groups/child_law/ tools_to_use/attorneys/joint_and_secondparentadoptions.html [accessed Dec. 27, 2013] [resolution acknowledging ABA’s support for laws and decisions that permit joint and second-parent adoptions by functional parents, regardless of marital status, where adoption is in child’s best interests]; Courtney Megan Cahill, Regulating at the Margins: Non-Traditional Kinship and the Legal Regulation of Intimate and Family Life, 54 Ariz L Rev 43 [2012]; Annette R. Appell, Controlling for Kin: Ghosts in the Postmodern Family, 25 Wis JL Gender & Soc’y 73 [2010]; see also n 10, supra).